# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2009-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.P.,

     Defendant-Appellant,

and

S.R.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.P.,

     a Minor.

_____

Argued January 25, 2019 – Decided February 22, 2019

Before Judges Simonelli, Whipple and DeAlmeida.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0062-16.

Anastasia P. Winslow, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Anastasia P. Winslow, on the briefs).

Natasha C. Fitzsimmons, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Natasha C. Fitzsimmons, on the brief).

Margo E.K. Hirsch, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Margo E.K. Hirsch, on the brief).

PER CURIAM

Defendant J.P. (Father) appeals from the December 15, 2017 judgment of the Family Part terminating his parental rights to his daughter L.P.[1] We affirm.

I.

The following facts are derived from the record. S.R. (Mother) gave birth to L.P. in 2006. L.P.'s parents have a long history of substance abuse that has significantly interfered with their ability to provide the child with emotional and

---

[1] We use initials to protect the privacy of the parties.

economic support, and a stable home for much of her life. The family first became known to the Division of Child Protection and Permanency (DCPP) in 2006 when it received a referral that Mother was pregnant with L.P. and wanted to give the child up for adoption because Father used drugs, was on probation, and was physically abusive. After consultation with a DCPP caseworker, Mother did not surrender her parental rights to L.P.

On May 1, 2012, DCPP received a referral that Mother was abusing OxyContin, Suboxone, and Prozac, and had not been seen in four days. During an investigation, Mother tested positive for opiates. At that time, L.P. was in the care of Father, who was residing in his mother's home. A week later, Father tested positive for cocaine.

As a result, DCPP filed an emergency Dodd removal of L.P.[2] The child was removed from Father and placed with her paternal grandmother, who was to supervise visits between Father and L.P. Father enrolled in a treatment program, where he admitted drug use since the age of thirteen, but was discharged four months later for non-compliance. After a fact-finding hearing,

---

[2] A Dodd removal is an emergency removal of a child from a parent's custody without a court order pursuant to N.J.S.A. 9:6-8.21 to -8.82, known as the Dodd Act. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 26 n.11 (2011).

which Father failed to attend, the court found that he abused and neglected L.P. by using cocaine while she was in his care, placing her at risk of harm.

In May 2013, the court approved DCPP's recommended permanency plan to terminate the parental rights of Father and Mother, followed by adoption of L.P. In the following months, Father did not visit with L.P. He provided a DCPP caseworker with what turned out to be a fake address, and missed several appointments for a substance abuse evaluation. Father next visited L.P. in February 2014, when his mother brought her to New York, where he was living.

On February 21, 2014, Father was arrested for driving with a suspended license. He was found to be in possession of heroin and marijuana. Less than a month later, on March 1, 2014, Father was again arrested for possession of heroin with intent to distribute.

Shortly thereafter, DCPP returned custody of L.P. to Mother, who had complied with services and remediated her drug use. Visits between Father and L.P. were to be supervised because he was not complying with services. At the time, Father indicated to a DCPP caseworker that he was "happy" that L.P. had been reunited with Mother and saw no reason to engage in services.

In March 2015, Father was arrested for driving with a suspended license. In the aftermath of his arrest, Father admitted he was using heroin, crack, and

marijuana. In April 2015, Father attended a detox program. He thereafter entered a twelve-month inpatient substance abuse treatment program. During treatment, Father admitted to daily use of thirty to forty bags of heroin, as well as use of cocaine, and excessive alcohol consumption.

A month later, Mother relapsed on heroin. DCPP then filed a Dodd removal of L.P. The child was placed with her maternal grandparents, with whom she had been living. Because Father was in an inpatient substance abuse treatment program, he was not available as a caretaker for L.P. DCPP provided monthly supervised visits between Father and L.P. at his program.

While in the treatment program, Father admitted he sold drugs to gang members, one or more of whom had threatened him. Because of the security threat, in August 2015, Father was discharged from the program. DCPP sought to continue Father's treatment elsewhere, but he rejected various alternative programs identified by DCPP.

On August 31, 2015, Father was arrested in Pennsylvania after selling heroin. He was charged with criminal conspiracy and felony distribution of a controlled dangerous substance, and jailed to await trial. L.P. asked that she not be made to visit her father in jail. The court suspended visitation, given the long trip to the facility, and the conditions at the jail, which included the use of a non-

5

contact, glass partition for visits. DCPP provided Father with regular updates on L.P. while he was awaiting trial. Father was convicted of the distribution charge and sentenced to twenty to sixty months in prison.

DCPP provided services to Father while he was incarcerated in various Pennsylvania prisons, including three psychological evaluations and a bonding assessment of Father and L.P. A DCPP caseworker visited Father on a monthly basis to keep him apprised of L.P.'s status and court proceedings. Father did not want L.P. to visit him while he was incarcerated. DCPP instead facilitated continued telephone contact between Father and L.P. During his incarceration, Father engaged in services provided by the prison, including relapse prevention, Alcoholics Anonymous, and a drug education program.

On June 14, 2016, DCPP filed a complaint seeking to terminate the parental rights of Mother and Father to L.P. Mother thereafter voluntarily surrendered her parental rights to the maternal grandparents. On August 14, 2017, Father was transferred on parole to a halfway house in Pennsylvania. He is to remain on parole until 2020. DCPP arranged for in-person, biweekly visits with L.P. At the time of trial, he had been sober since his imprisonment.

A trial commenced on September 11, 2017. At the time, Father anticipated his release from the halfway house, but had not secured permanent

A-2009-17T4

employment or stable housing. DCPP did not consider him to be a viable option for permanency for L.P., as he was unlikely to be able to provide a safe, stable, and appropriate home for her in the foreseeable future. An expert testified that Father has a personality disorder, "strong anti-social tendencies," and was at a high risk to relapse "into an antisocial lifestyle that includes drug abuse, engaging in criminal activity, impulsiveness, poor judgment and irresponsible behavior." The expert opined that Father would have to secure work, sobriety, and stable, safe, and independent shelter for at least three years before he could be considered appropriate to care for L.P. The expert also testified that were Father to regain custody of L.P., and then relapse, she would be traumatized by having her custody transferred yet again.

J.P.'s maternal grandparents, with whom she had resided since August 2015, expressed their desire to adopt L.P. They were willing to permit Father to have supervised visitation with L.P. in the event his parental rights were terminated. The maternal grandparents had regularly allowed L.P. to visit her paternal grandmother and other members of her paternal family. L.P. expressed her desire to be adopted by her maternal grandparents.

At a bonding evaluation conducted during his incarceration, Father acted appropriately and L.P. responded well. However, an expert opined that despite

7

her comfort with Father, L.P. does not know him as a predictable, consistent, and reliable parent and that her attachment to him is insecure. The expert opined that while L.P. would be upset if Father's parental rights were terminated, she would not suffer emotional harm.

This contrasts with the expert testimony regarding the bond between L.P. and her maternal grandparents. The expert described that bond as secure, and opined that L.P. is aware of her parents' substance abuse addictions and that her maternal grandparents have been providing her with stability and safety. She perceives them as parental figures, and calls them "grammy and poppy," rather than "mom and dad," signifying her understanding of the situation. The expert opined that L.P. would suffer serious and enduring harm were she to be separated from her maternal grandparents, and that delaying permanency for L.P. to give Father additional time to achieve stability and demonstrate long-term sobriety would be harmful to L.P. and create additional stress for her.

Father presented no witnesses on his behalf. The opinions of the expert called by DCPP, therefore, were not controverted.

On December 15, 2017, the trial court issued a comprehensive written opinion in which it concluded that DCPP had satisfied each of the four prongs

set forth in N.J.S.A. 30:4C-15.1(a), and that termination of Father's parental rights to L.P. was warranted.

This appeal followed. Father argues that the trial court erred with respect to the strength of DCPP's evidence as to each prong of the statute. While he argues that it was error to terminate his parental rights to L.P., he does not seek custody of the child. He instead asks this court to vacate the order terminating his parental rights, and to direct that L.P. remain in the custody of her maternal grandparents, while he maintains the right to visit the child. L.P.'s law guardian supports the trial court's decision.

## II.

Our scope of review on appeal from an order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's factfindings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); see Cesare v. Cesare, 154 N.J. 394, 413 (1998). "Only when the trial

court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting G.L., 191 N.J. at 605). We also accord deference to the judge's credibility determinations "based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). No deference is given to the court's "interpretation of the law" which is reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

When terminating parental rights, the court focuses on the "best interests of the child standard" and may grant a petition when the four prongs set forth in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). "The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." Id. at 348.

N.J.S.A. 30:4C-15.1(a) requires the Division to prove:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to

10

provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3)     The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4)     Termination of parental rights will not do more harm than good.

After carefully reviewing Father's arguments in light of the record and applicable legal principles, we are convinced there is substantial credible evidence supporting the trial judge's findings of fact and legal conclusion that it was in L.P.'s best interests to terminate Father's parental rights. We address the four statutory prongs in turn.

1.     <u>Prong One.</u>

The first prong requires DCPP to establish that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). "[T]he Division must prove harm that 'threatens the child's health and will likely have continuing deleterious

effects on the child.'" N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352).

The harm need not be physical, as "[s]erious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992). The focus of the harm is not on an isolated incident, but rather "the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. "Moreover, '[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect.'" Div. of Child Prot. & Perm. v. E.D.-O., 223 N.J. 166, 178 (2015) (alteration in original) (quoting In re Guardianship of DMH, 161 N.J. 365, 383 (1999)).

The harm may be established by "a delay in establishing a stable and permanent home . . . ." DMH, 161 N.J. at 383. "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Id. at 379. Additionally, a parent's "persistent failure to perform any parenting functions and to provide . . . support for [the child] . . . constitutes a parental harm to that

12

child arising out of the parental relationship [that is] cognizable under N.J.S.A. 30:4C-15.1(a)(1) and (2)." Id. at 380.

The trial court concluded the first prong was established because L.P. was harmed by Father's inability to provide a safe and stable home for her, and his failure to address his longstanding drug addiction for most of her life. In addition, the trial court found that Father harmed L.P. by engaging in criminal activity that resulted in his incarceration for approximately two years.

Father argues that the trial court's finding that his drug use harmed L.P. was erroneous because the record contains no evidence that he ever was intoxicated or under the influence of narcotics in L.P.'s presence. In addition, he argues that the trial court erred by weighing the time he spent away from L.P. in treatment programs against him. He contends that the court's analysis creates a disincentive to seek medical attention for drug addiction.

The record clearly and convincingly supports the trial court's decision. Father has not provided a stable, nurturing, and secure home for L.P. since at least May 2012, when he tested positive for cocaine while L.P. was in his custody. In the years that followed, Father continued to use cocaine, heroin, and other narcotics. He engaged in criminal activity related to the distribution of heroin, and, by his admission, sold drugs to gang members. Father's criminal

13

acts resulted in a lengthy period of incarceration, during which he was separated from L.P., who was a preteen effectively growing up without her father. She had no physical contact with Father for most of his imprisonment. While not determinative, "[a] parent's lengthy incarceration is a material factor which bears on whether parental rights should be terminated." R.G., 217 N.J. at 555 (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 143 (1993)).

The trial court accepted the testimony of DCPP's expert that Father's substance abuse and absences had been "profoundly detrimental" to L.P. In fact, the record reveals that L.P. refused to meet Father for a bonding evaluation while he was in prison, and was able to do so only after therapeutic intervention. L.P. had, since shortly after her first separation from her parents, been experiencing symptoms consistent with sustained psychological distress.

At the time of trial, Father had experienced some success at remaining free from substance abuse. Notably, the vast majority of the time he was sober was while he was in the controlled environment of a prison or a halfway house. While recognizing this achievement, the trial court accepted an expert's testimony that Father is a high risk to relapse upon his return to the community, given his history of drug abuse and anti-social personality traits.

Nor do we agree with Father's contention that the trial court weighed Father's time in substance abuse treatment against him. In its findings of fact, the trial court noted that Father was unavailable as a placement for L.P. at the time of Mother's surrender of her parental rights because he was in treatment. The notation merely explains why Father was not considered as a placement for L.P. Moreover, the time that Father spent in inpatient treatment was limited. His most extended absence from L.P.'s life was during his incarcerations.

2.    Prong Two.

"The second prong, in many ways, addresses considerations touched on in prong one." F.M., 211 N.J. at 451. The focus is on parental unfitness. K.H.O., 161 N.J. at 352; DMH, 161 N.J. at 378-79. In considering this prong, the court should determine whether it is reasonably foreseeable that the parent can cease to inflict harm upon the child. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 607 (1986). The second prong may be satisfied

> by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, the withholding of parental attention and care, and the diversion of family resources in order to support a drug habit, with the resultant neglect and lack of nurture for the child.
>
> [K.H.O., 161 N.J. at 353.]

A-2009-17T4

"Prong two may also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with foster parents.'" F.M., 211 N.J. at 451 (alteration in original) (quoting K.H.O., 161 N.J. at 363).

The trial judge found that although Father has had a period of sobriety during his incarceration, his plans for providing a stable and secure environment for L.P. were not realistic. The court accepted the expert's testimony that Father was likely to relapse to a life of antisocial behavior, including drug use. In addition, the court accepted the expert's opinion that Father would have to maintain a period of three years of sobriety, employment, and stability in housing to be considered as a caregiver for L.P. The court determined that this was too long a period to wait for permanency for L.P., who spent a good portion of her childhood without support from Father, and uncertain as to her future stability. The court found that such a delay would visit further harm on L.P.

Father argues that the trial court erred when it accepted the expert's opinion regarding the length of time necessary for him to establish his sobriety and appropriateness as a parent for L.P. In addition, he argues that the court gave too little weight to his efforts at rehabilitation before his incarceration, and his sobriety and program participation while in prison.

Our review of the record leads us to conclude that there is sufficient credible evidence supporting the trial court's conclusion that the DCPP satisfied the second statutory prong by clear and convincing evidence. The court accepted the only expert testimony offered: that Father had an insufficient period of sobriety to establish that he was an appropriate placement for L.P. In addition, we note that Father does not seek custody of his daughter. He instead demands that she remain in the custody of her grandparents, without permanency, so Father can have a right to visit her. He is, therefore, not arguing that he can provide a safe and stable home for L.P., but that he does not want to have his right to visit the child disturbed.

3.    Prong Three.

Under prong three, the trial court must consider whether DCPP "made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home . . . ." N.J.S.A. 30:4C-15.1(a)(3). DCPP's efforts must be analyzed "with reference to the circumstances of the individual case[,]" including the parent's degree of participation. DMH, 161 N.J. at 390.

N.J.S.A. 30:4C-15.1(c) defines reasonable efforts as those reasonable "attempts by an agency authorized by [DCPP] to assist the parents in remedying

the circumstances and conditions that led to the placement of the child and in reinforcing the family structure[.]" The statute sets forth examples of "reasonable efforts," including but not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [Ibid.]

The trial court found that DCPP provided numerous services to Father in an attempt to reunify him with L.P. The agency identified treatment programs for Father, facilitated his visitation with L.P., arranged for telephonic contact between Father and L.P. during his incarceration, and provided psychological and bonding evaluations and frequent communications regarding the status of L.P. and judicial proceedings.

Father disputes the extent of DCPP's efforts to assist him in addressing his substance abuse. In addition, he argues that DCPP should have considered as an alternative to terminating his parental right allowing L.P. to remain in the

custody of her maternal grandparents, effectively under kinship legal guardianship (KLG). We find these arguments unpersuasive.

The record contains clear and convincing evidence that DCPP assisted Father with addressing his substance abuse. There are many instances in the record documenting Father's failure to complete treatment programs, attend evaluations, and assist with placements. At one point, he gave DCPP a fake address and avoided communications from the agency. Despite Father's resistance, DCPP persisted in its efforts to assist him in addressing the harm he was visiting on L.P. by his drug use, and criminal behavior related to drugs.

In addition, DCPP considered alternatives to termination of Father's parental rights, including KLG. The statutory prerequisite for KLG is that adoption is "neither feasible nor likely[.]" N.J.S.A. 3B:12A-1(b); N.J.S.A. 3B:12A-6(d)(3). The legislative intent is a preference for adoption as the most permanent plan for children who cannot be returned to their parents. N.J.S.A. 3B:12A-1(b) and (c). KLG is not a defense to termination of parental rights. N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 510 (2004). Nor is it a substitution for adoption. Ibid. It is, instead, a method providing as much permanency as possible for children for whom adoption is not feasible or likely, unless they reach the age of eighteen. Ibid.

Here, L.P.'s maternal grandparents are eager to adopt her. DCPP discussed KLG with them and they rejected the concept. They would like to provide a permanent and stable home to L.P., and give her the support and security that comes with adoption. The maternal grandparents told an expert that years of delays in achieving permanency are "tormenting" L.P. KLG would not provide L.P. with the permanence she understandably desires after years of insecurity visited upon her by her biological parents.

Nor do we find support for Father's contention that DCPP failed to consider his mother as a placement for L.P. While L.P. was for a time in the custody of her paternal grandmother, she thereafter was placed with her mother. When Mother relapsed, L.P. was residing with her maternal grandparents. There is no indication in the record that L.P.'s paternal grandmother made herself available as a placement option for L.P. at that time, or objected to her placement with her maternal grandparents. To the contrary, the court found that L.P.'s grandparents have a positive relationship, and that L.P. regularly visited her paternal grandmother and family members while in the custody of her maternal grandparents. If the paternal grandmother believed she was the better placement for L.P., and was willing to take custody of the child, she did not make that known to DCPP.

4.    Prong Four.

The fourth prong requires DCPP to show "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). Termination of parental rights poses a risk to children due to the severing of the relationship with their natural parents, but it is based "on the paramount need the children have for permanent and defined parent-child relationships." K.H.O., 161 N.J. at 355 (quoting In re Guardianship of J.C., 129 N.J. 1, 26 (1992)).

Thus, "the fourth prong of the best interests standard [does not] require a showing that no harm will befall the child as a result of the severing of biological ties." K.H.O., 161 N.J. at 355. Prong four "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. "[T]he question to be addressed under [prong four] is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from permanent disruption of her relationship with her foster parents." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 181 (2010) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002)).

Generally, to prove the fourth prong, DCPP "should offer testimony of a well qualified expert who has had full opportunity to make a comprehensive,

objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007)); See R.G., 217 N.J. at 564 (finding the Division's position lacked support because "no bonding evaluation was conducted"); N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 432 (App. Div. 2009) (affirming an order denying the termination of parental rights where no bonding evaluation was conducted).

Here, the trial court relied on expert testimony that L.P. had a secure and enduring parental bond with her maternal grandparents. The court found that her bond with Father, on the other hand, was "insecure 'at best.'" The court recognized that Father and L.P. had a positive experience during a prison visit. However, the court accepted the expert's testimony that during an evaluation Father displayed a grandiose, unrealistic opinion of himself and his ability to provide for L.P. The expert found this behavior to be consistent with a years-long pattern of Father making promises to L.P. that he did not keep, leading to her disappointment and emotional pain. The court found the one-hour positive visitation to be insufficient to overcome concerns about Father's ability to provide security to L.P.

A-2009-17T4

The court also accepted the expert's testimony that severing L.P.'s bond to her maternal grandparents would lead to serious and enduring harm to the child. The maternal grandparents are the only consistent parental figures L.P. has known. The court accepted the expert's opinion that Father would be unable to mitigate this harm, given his underlying antisocial personality disorder, which makes him unable to recognize the needs of L.P. and put those needs before his own. In addition, the court adopted the expert's testimony that L.P. will not suffer any serious or enduring harm if Father's parental rights were terminated.[3] Father offered no conflicting expert testimony.

The expert testimony provides clear and convincing evidence supporting the trial court's conclusion that DCPP established the fourth prong of the best interests of the child test.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] The court noted that while the maternal grandparents' intentions of permitting future supervised contact between Father and L.P. cannot be enforced legally once they adopt L.P., they have consistently allowed such contact in the past. The court also noted that the maternal grandparents had made arrangements to have L.P. visit with paternal relatives twice a month. The court found that it had no basis to believe that the maternal grandparents would prevent L.P. from having contact with her father or his family were they to adopt L.P.

A-2009-17T4